STATE, EX REL. ORPHEUS B. POLK, RELATOR, V. ALGERNON GALUSHA, SECRETARY OF STATE, RESPONDENT.

FILED JUNE 22, 1905. No. 14,256.

1. **Constitutional Law.** When it is obvious that portions of an act of the legislature were the principal if not the sole inducement for the passage of the act, and such parts are held to be unconstitutional because in conflict with the paramount law, the act will be declared void *in toto*.

2. **General Elections.** The provision of section 13, article XVI of the constitution, wherein it is provided, "The general election of this state shall be held on the Tuesday succeeding the first Monday of November of each year, except the first general election, which shall be on the second Tuesday in October, 1875," construed, and *held*, that it is not of itself an imperative command that general elections shall be held annually at the time stated. Whether annual elections are required depends upon the offices created by the fundamental law, and the time as therein provided at which an election must be held to fill such offices.

3. ————. By the provisions of the constitution, sections four (4); ten (10), fifteen (15), twenty (20) and twenty-one (21) of article six (6), and sections thirteen (13) and twenty (20) of article eighteen (18), judges of the supreme, district and county courts, and regents of the university, whose offices are created thereby, it is declared, shall be elected at the first general election held in 1875. The terms of these several officers are fixed at six, four and two years respectively, and the terms of office begin on the first Thursday after the first Tuesday in January next succeeding their election. Their successors in office, it is provided, shall thereafter be elected at the general election next preceding the time of the termination of their respective terms of office. *Held*, That these several provisions, when construed together, fix the terms of office, and the time of the beginning and termination of such terms, and the time of the first election, and that thereafter at the general election next preceding the time of the termination of each and every subsequent term of office, as they shall follow each other in succession, a successor shall be elected, and that

these several sections provide for a regular succession of and continuity in such terms of office, the force and effect of which are to make it mandatory that a general election shall be held in each of the odd numbered years.

4. **Term of Office.** Ordinarily, the word or words "term" or "term of office," when used in reference to the tenure of office, mean a fixed and definite period of time.

4a. ———. Section 20, article VI of the constitution, declares, "All officers provided for in this article shall hold their offices until their successors shall be qualified." *Held*, That this provision cannot properly be construed to mean that the legal terms of office of the officers provided for in said article, in the sense in which used in reference to the tenure of office, shall consist of the fixed and definite periods therein mentioned, and in addition thereto the indeterminate period which an incumbent may hold after the expiration of his fixed term, and until a successor shall be qualified.

5. ———: LEGISLATIVE POWER. Where by the fundamental law certain offices are created, the terms of office of which are fixed at certain definite periods of time, and the beginning and termination thereof prescribed, as well as the time for the election of a successor, the legislature is without authority to postpone the election of such successors until the succeeding general election held in the next year, and to extend the term of office of the incumbents during the intervening time, and to provide for an election in a different year in which to elect such successors, and a different time for the beginning of such terms of office.

6. **Constitution:** INTERPRETATION. Provisions found in the schedule of the constitution are not in all instances to be construed as of a temporary character. The language used should be given its ordinary meaning; and whether it is intended to be of a temporary or permanent character must be determined from the purpose of the enactment and the object sought to be accomplished thereby. The true meaning of the law is discovered by considering the reason and spirit of it, or the cause which moved the lawmaking body to enact it.

7. ———: LEGISLATIVE CONSTRUCTION. Courts will give weighty consideration to the legislative construction of the constitution when legislation is had regarding subjects of a political nature. But when such construction clearly appears to be unwarranted it will not be followed.

7a. **Constitutional Law.** The provisions of the biennial election law (laws 1905, ch. 65), the act under consideration, are found to be in conflict with the paramount law relative to the election of

judicial officers and regents of the university, and the time thereof, and of their terms of office; and for such reasons the act is *held* to be inoperative and void.

ORIGINAL application for a writ of mandamus to require respondent to place relator's name on official ballot. *Writ allowed.*

*C. S. Allen* and *T. C. Munger,* for relator.

*L. M. Pemberton, amicus curiæ.*

*Norris Brown, Attorney General, W. T. Thompson, L. I. Abbott, J. J. Sullivan, Roscoe Pound* and *F. I. Foss,* for respondent.

HOLCOMB, C. J.

Since the adoption of the present constitution, the statutes as heretofore existing have provided for the election of the judges of the supreme court, the regents of the university, judges of the district courts, and county judges, all of whose terms of office are fixed by the fundamental law, at a general election held in November of the odd numbered years. The terms of the different offices named vary; some being for six, some for four, and some two years, begining on the first Thursday after the first Tuesday of January of the year next succeeding the time of the election. It is expressly provided by the constitution that the elections for state executive officers shall be held in the even numbered years, the first election to be held at the general election in November in 1876, and each succeeding election at the same relative time in each even year thereafter. Const. art. V, sec. 1. The legislature at its last session passed, and the governor approved, an act, the object and purpose of which is to provide for the election of all state, district, and county officers in even numbered years, and to repeal all existing laws in conflict therewith. This act is known as the biennial election law, since, if valid, general elections will be held hereafter in

this state only once in every two years, while heretofore annual elections have been the rule under laws as then existing.

The relator in this action has challenged the validity of the new act (laws 1905, ch. 65), on the ground that it is in conflict with several provisions of the organic law. The single issue before the court presented by the pleadings is in respect of the authority of the legislature to enact into law the measure referred to. The following sections of the constitution seem to have a bearing on the act under consideration either direct or remote, and which should here be stated as the basis of the discussion to follow. Section 13, article XVI, entitled "Schedule," declares that "the general election of this state shall be held on the Tuesday succeeding the first Monday of November of each year, except the first general election which shall be on the second Tuesday in October, 1875. * * * Judges of the supreme, district and county courts, * * * shall be elected at the first general election, and thereafter at the general election next preceding the time of the termination of their respective terms of office." Section 14 of the same article provides: "The terms of office of all state and county officers, of judges of the supreme, district and county courts, and regents of the university shall begin on the first Thursday after the first Tuesday in January next succeeding their election." Section 4 of article VI provides: "The judges of the supreme court shall be elected by the electors of the state at large; and their terms of office, except of those chosen at the first election, as hereinafter provided, shall be six years." Section 10 of article VI divides the state into six judicial districts, and provides for the election of a judge of the district court in each of said districts, "whose term of office shall be four years." Section 15 of the same article provides: "There shall be elected in and for each organized county one judge, who shall be judge of the county court of such county, and whose term of office shall be two years." Section 20 provides: "All officers provided for in this article

shall hold their offices until their successors shall be qualified." Section 21 provides: "In case the office of any judge of the supreme court, or of any district court, shall become vacant before the expiration of the regular term for which he was elected, the vacancy shall be filled by appointment by the governor, until a successor shall be elected and qualified, and such successor shall be elected for the unexpired term at the first general election that occurs more than thirty days after the vacancy shall have happened." Section 22, article XVI, provides: "The regents of the university shall be elected at the first general election under this constitution, and be classified by lot so that two shall hold their offices for the term of two years, two for the term of four years, and two for the term of six years."

The distinctive features of the present act and the one attempted to be repealed are quite marked. Section 1 of the old act, which embraced a general election law, provided the general election shall be held in November of each year. The same section of the new act provides that the general election of this state for the election of officers named in section 7 of this chapter shall be held in November of each even numbered year; and section 7 enumerates all state, district and county officers who under the old law were to be elected in the odd numbered years (with possibly some few exceptions provided for in separate acts), so that at the present time, if the new act be held valid, there are no offices to be filled and no officers to be elected at a general election to be held in the odd numbered years; and there being no officers to elect, there can, of course, be no election.

Keeping in mind the generally accepted canons of construction for the testing of the validity of legislative enactments when challenged on constitutional grounds, which are to the effect that the constitution is not a grant of powers, but is a limitation upon the authority to be exercised by the legislative branch of government, and that all reasonable doubts are to be resolved in favor of

the legality of the acts of the legislature, do the provisions of the act in question so conflict with the fundamental law as that the statute must be held nugatory and ineffectual to accomplish the legislative purpose?

1. We assume, without extended discussion, that if the act fails in its purpose to provide for biennial elections, and that notwithstanding its provisions annual elections are required to be held for the election of officers for one or more offices therein mentioned, because of the requirements of the organic law, the act is void *in toto* and of no effect for any purpose. It is hardly to be doubted that the principal, if not the sole, inducement for the passage of a measure of the kind being considered was for the purpose of avoiding the holding of general elections once in each and every year, and if this is not accomplished the whole act must fall and be declared invalid under the rule now well established in this jurisdiction. *State v. Farmers & Merchants Irrigation Co.*, 59 Neb. 1; *Crawford Co. v. Hathaway*, 60 Neb. 754; *State v. Poynter*, 59 Neb. 417; *State v. Magney*, 52 Neb. 508.

2. It is argued in behalf of relator that the portion of section 13, heretofore quoted, which says, "The general election of this state shall be held on the Tuesday succeeding the first Monday of November of each year," etc., is an imperative command requiring annual elections. The language used, when considered alone, does not, as it seems to us, unmistakably call for such construction, especially when viewed in the light of conditions existing at the time the present constitution was adopted. Prior to its adoption, and under the 1866 constitution, the elections for state and county officers in this state were held in the month of October, while the election of federal officers was required to be held in November. The principal object sought to be attained by the constitution makers, as it seems to us, was to have the general election for both state and federal officers held in November, and thus bring about greater uniformity, as well as add to the convenience of the electorate, and insure economy in time and

16

pecuniary expenditure in the operation of the election machinery of the state.

Had the language been, "A general election shall be held," etc., using the indefinite article "a" instead of the definite article "the," the language would have been, we think, more strongly in favor of the construction contended for by the relator. It would have added something to the view that the framers of the constitution, and the people in adopting it, intended that there should be an election in each year. Reading the sentence in the exact language in which we find it constructed, and keeping in view the conditions then existing in respect to the time of holding state and national elections, and it appears not to be an unreasonable construction to say that the main thought expressed is that the time of the general elections shall be in November of each year in which such an election is required to be held to fill any office created by law. The legislature having given such construction to the language regarding a subject of legislation purely political in its nature, we would now hardly be warranted in construing it differently in passing on the validity of such provision. It would lead to an absurdity to say that the constitution commanded that an election should be held annually, unless there were other provisions which necessarily require that certain of the offices therein created must be filled at such elections. Unless we can find in other provisions of the permanent law some requirements to the effect that certain officers ought to be elected at a general election, the time of the holding of which is so regulated by that instrument as that such election must be held in the odd numbered years as is required in the even years, we do not think we are driven by the language under consideration to the conclusion that a law providing for biennial elections is in excess of legislative authority. We are not to be understood as saying this language, when considered with its context and with other sections of the constitution, is not to be construed as an expression of the constitution makers indicative of an intention to so ar-

range the time of holding general elections as that a general election, if the terms of that instrument be observed and made effective, must be held once in each year. We only reject the idea, which is advanced by the relator, that the language standing alone is susceptible of no other construction than that annual elections are imperatively commanded. As has been said by the supreme court of Kansas in construing a constitutional provision somewhat similar: "The provision simply declares that annual elections shall be held on the Tuesday succeeding the first Monday in November, and was obviously intended to fix the time for general elections, and also to provide an annual opportunity for the election of officers who, under the law, are to be chosen annually, or to be elected in any year." *Wilson v. Clark*, 63 Kan. 505.

3. Construing the language of the several sections of the constitution which are quoted above as they relate to and have a bearing on each other, we find no serious difficulty in satisfying our minds that the purpose sought to be attained thereby is reasonably clear. If we are right in our construction of the several provisions as to their force and effect, they can readily be applied to the act under consideration in testing its validity. The terms of the offices of the judges of the supreme, district and county courts are fixed with definiteness and certainty. Section 4 is devoted exclusively to the terms of the supreme judges, while sections 10 and 15 refer especially to the offices of district and county judges. There can be no doubt and no room for construction as to the intention of the lawmakers in this regard. By the provisions of section 13, article XVI, it is, in terms that cannot be well misunderstood, declared that the first general election shall be held in 1875, that judges of the supreme, district and county courts shall be elected at the first general election, and thereafter at the general election next preceding the time of the termination of their respective terms of office. That is, by these several sections, when construed together, as of course they ought to be in an effort to determine their

meaning, force and effect, the offices are provided for, the terms for which the office shall be held are fixed, the time of the general elections to fill such offices, the time when the first election shall be held and the time of holding the election for the successor of the incumbent just prior to the termination of his incumbency for the term for which elected are all provided for.

The law as a science possesses, it must be admitted, some elements of uncertainty, and can hardly be classed as one of the exact sciences. In respect, however, of the matter under consideration, the meaning of the framers of the constitution and of the people adopting it, it would seem, can be ascertained to almost the certainty of a mathematical demonstration. The first election to fill these offices is required to be held at the general election in 1875. The terms of office are six, four and two years, respectively. The terms begin on the first Thursday after the first Tuesday of January next succeeding the time of the election. The election of successors is to be had at the general election next preceding the time of the termination of their respective terms of office. The terms begin and end in January of the even numbered years, and the general election next preceding is the election to be held in the odd numbered years. Thus, as it appears to us, the constitution declares in unmistakable terms that these officers shall be elected and the offices filled at a general election which is required to be held in the years alternating with the general elections provided for state executive officers in the even numbered years. Of course, the language used to express the will of the people in this regard in the fundamental law could have been more specific and direct, but we must accept the wording as we find it in the law, and give to it its fair meaning and reasonable import.

But again, by the provisions of section 21, if the office becomes vacant, the governor is to appoint a person to fill such vacancy, and such appointee can hold only until his successor is elected and qualified, and the successor, when

elected, is chosen for the remainder of the unexpired term. The constitution by these several sections provides not only for the first term after its adoption, but for the second and all subsequent terms. The arrangement of the terms is made continuous. The word "thereafter" found in section 13 can have no other meaning than that at the general election next preceding the time of the termination of each and every subsequent term of office, as they shall follow each other in succession, a successor shall be elected. Unless, then, the terms of office may be extended or are different from the fixed and definite periods of six, four, and two years, respectively, the conclusion is, we think, inevitable that the act under consideration contravenes the paramount law. In this connection, we think it permissible to briefly refer to the history of the state, and to its laws anterior to the adoption of the present constitution, as they relate to the election laws as then existing. By the constitution of 1866 the terms of the judges of the supreme court were fixed at six years, as at present. But by the terms of that instrument they were to be elected at such time and in such manner as might be provided by law. The election law (Gen. St. 1873, ch. 20, sec. 2) provided that "the judges of the supreme court shall be elected in the year 1878, and every six years thereafter." By this same statute state executive officers were to be elected in the year 1874, and every two years thereafter. Thus it will be seen that executive and judicial officers were elected at the same general election, and in even numbered years. Mindful of the conditions then existing, and of the laws then in force, may we not with reason attach some special significance to the provisions under consideration, incorporated, as they were, in the organic law framed and adopted in the year 1875?

4. Our discussion to this point has proceeded on the theory that the terms of office, as used in the provisions of the constitution quoted, when construed with reference to the correct meaning of that instrument in providing for the election, the time thereof, the terms of office, and the

succession of incumbents, are to be understood as the fixed and definite periods of time therein stated; and, if we are correct in this, then it must logically follow that the act in controversy is an unwarranted interference with the terms of office as thus provided for, and, contrary to well-settled principles, extends the terms of the present incumbents beyond the times as therein provided.

We are here met with the proposition that section 20, which says, "All officers provided for in this article shall hold their offices until their successors shall be qualified," etc., is to be construed as making the constitutional term of office the fixed and definite periods of six, four and two years, respectively, and in addition thereto the uncertain and indeterminate period of "until their successors are qualified." Consequently, it is argued the act in question violates none of the provisions relative to the length of the terms of the offices therein provided for. It is said the authorities are uniform as to this proposition. In a sense, they undoubtedly are, and, in another sense, the authorities are equally uniform to the point that the legal definition of the word term is the fixed and definite period of time stated in the law. It all depends on the viewpoint—on the nature of the question which is receiving judicial attention. These hold-over provisions in the law are generally understood to be for the purpose of having an incumbent in a public office at all times —to provide for the one holding an office to continue therein and to discharge the duties thereof until a successor, either by election or by appointment, is installed. In this sense, the officer continues to hold his office *de jure* in continuation, and as a part of the definite term and fixed period of time for which selected. But, in the sense of fixing tenures of office and providing for the duration thereof, and for the selection of a successor it cannot, we think, be said, in strict correctness, that the definition of the word term means the uncertain and indeterminate period which an incumbent may hold over his fixed term, because of some fortuitous circumstance

which has prevented his successor from qualifying at the time contemplated in the natural and ordinary course of events. This court has said: "Holding over beyond the fixed term of an officer pending the election of a successor in pursuance of the requirements of the constitution is as much a part of the term of office as that which precedes it." *State v. Moores,* 61 Neb. 9. In the sense in which used in the authority cited, the correctness of the proposition is indisputable. The constitutional provision is obviously to meet just such conditions, and to permit the incumbent to extend his fixed term until a successor is qualified. But, nevertheless, speaking with accuracy, there legally exist two tenures in the case cited, the fixed term and the hold-over term, and the time the incumbent holds the office beyond the fixed term is just so much an encroachment on the term of the successor. Ordinarily, say the authorities, the word "term" or "term of office" when used in reference to the tenure of office, means a fixed and definite period of time. *Crovatt v. Mason,* 101 Ga. 246, 28 S. E. 891; *State v. Breidenthal,* 55 Kan. 308, 40 Pac. 651; *State v. Tallman,* 25 Wash. 295, 64 Pac. 759; *People v. Brundage,* 78 N. Y. 403; *State v. Stonestreet,* 99 Mo. 361, 12 S. W. 895. In *State v. Stonestreet, supra,* it is said:

"Whether we take the phrase, 'term of office,' in its ordinary or popular sense, or in its technical import, it means one and the same thing—'a fixed and definite period of time.'"

In that case the decision was under a statute authorizing the appointment of an oil inspector for the term of two years, and which fixed the beginning and the ending of his term, and thereby determined the beginning and ending of the term of his successor, each holding for the term of two years. It was also provided that the officer should hold his office until his successor was appointed and qualified. It will be noticed, at once, that, in principle, the provisions of the statute there being considered and the constitutional provisions we are discussing are

analogous to a marked degree. It was in that case held, however, that the provisions for holding over until a successor qualified did not affect or alter the fixed and definite term of two years; the officer holding over being regarded as holding a part of his successor's term. It may here be mentioned that the almost universal holdings of the courts in passing on a question of this character are to the effect that the hold-over period of an incumbent under provisions for holding the office until a successor is qualified has the inevitable effect of encroaching on the term of the successor, and, to the extent of the period holding over, is a shortening of the term of such successor, so that, in contemplation of law, the terms of fixed periods of time follow one after the other in the passing of time, whether held by the predecessor in office under the provisions for holding over, or by the one installed at the beginning of the fixed and definite period for the full term. It is said in *Crovatt v. Mason, supra:*

"It is apparent that the provision 'or until his successor is elected and qualified' does not reduce or change the term for which the officer is elected, but the meaning of such phrase is to extend the time in which he may hold the office beyond his term to a period when the office is filled by another who has been elected and qualified."

Say the supreme court of Kansas in *State v. Breidenthal, supra:*

"It is the opinion of the court that, as a 'term' means a fixed and definite period of time, the time definitely fixed in the law at four years is the term of office."

The term of office so fixed by the legislature was for four years, and until a successor was appointed and qualified. The constitution of that state provides that the legislature shall not create any office, the tenure of which shall be longer than four years.

*State v. Tallman, supra,* is relied on by both parties to the present controversy as authority in their favor. As we read the decision, it recognizes the term to be that fixed and definite period of time which the law prescribes that

an officer shall hold the office, and that a statute, which enables him to hold after his term has expired, does not change the term.   It also holds to the proposition that, when the law making power assigns a stated period of time as the term of an officer, the fact that an officer is allowed to hold over does not change the length of his term, but merely results in shortening the time that his successor holds the office, although it does not affect the legal length of the succeeding term.   It follows, we think, from a consideration of the authorities, and in sound reason, that the term of office, the tenure the lawmakers had in view, and which is contemplated by and designated in the provisions of the constitution to which reference has been made, is the fixed, certain and definite period of time therein specified, and not such fixed period, and in addition thereto the indeterminate period which is authorized to provide against contingencies of an accidental nature under the provisions of section 20, article VI, above quoted.

5. With the term of office of the officers named in the constitutional provisions quoted fixed and made definite and certain, the time of the beginning of such term and the termination thereof provided for, and with the time of the election for the first and subsequent terms stated in express terms, how stands the case and what is the effect of these several provisions on the act in controversy? The inevitable result of the act, if it be a valid one, is to extend the terms of all present incumbents of the offices provided for by such constitutional provision for one year, and to defer the time of the election of successors from the time of the general election, as heretofore held in the odd numbered years, to the next succeeding general election to be held in the even numbered years.   The successors of the present incumbents, if we are correct in our definition of the words "term of office" as used in these several provisions, should, if they be given force and effect, be elected at a general election held in November, 1905, 1907 and 1909, respectively.   By the terms of the

act under consideration, if it becomes operative, the electorate will be deprived of the privilege of choosing the successors of these several officers at the times stated; the incumbents holding over not being the choice of the voters, but under legislative authority creating a special and particular term in addition to the term fixed by the constitution.

In *State v. Thoman,* 10 Kan. 191, it is held that, as "the constitution of the state fixes the term of office of the judges of the district court at four years, and it is not in the power of the legislature to increase or extend that term either directly or indirectly," and that when the manifest purpose of the constitutional provisions are to secure not only a fixed term of office, but also to the people at stated intervals the opportunity of changing the incumbents, these provisions must prevail as the paramount law, over those expressed in the statute in conflict therewith. Says Brewer, J., writing the opinion of the court:

"The term of office is, as we have seen, four years. This being a constitutional provision is beyond legislative change. It is a fixed quantity." And again: "The manifest purpose of the constitutional provisions is to secure not merely a fixed term of office to judges, but also to the people at stated intervals the opportunity of changing the incumbents. * * * The constitutional provision is, that in each district 'there shall be elected by the electors thereof a district judge, who shall hold his office for the term of four years.' This does not apply to the first district judges alone, but establishes a permanent rule. It would seem a fair implication that such election should be held at the last general election prior to the commencement of such term. That would be consonant with the general rule governing all elections everywhere, and a constitution, as well as the statutes, must be construed in the light of settled and general usage."

In a very recent case (*Gemmer v. State,* 163 Ind. 150, 71 N. E. 478), the supreme court of Indiana, in passing on a statute deferring the time of the election of certain officers

for a year, and in which are raised many questions quite similar to those involved in a decision in the case at bar, hold that political privileges conferred on the people by the constitution are beyond legislative interference as effectually as if the constitution expressly provided that the people should not be deprived of them by any legislative enactment. Also, that a provision of the constitution to the effect that an officer shall hold his office until his successor is elected and qualified, being intended to prevent vacancies in public offices, does not confer on the legislature the power to postpone the election of a successor, and create a condition authorizing the incumbent to hold over. It is contended by counsel for respondent that the only question necessary to a decision in the case just cited was with reference to the power of the legislature to provide for the incumbent to hold office for more than four years in a period of six years, contrary to an express provision in the constiution limiting the term of any one incumbent to not more than four years in any period of six years. While it is true that the latter question may have been sufficient to dispose of the case then being considered, it is also clearly to be seen by a reading of the court's opinion that the discussion of the other questions to which we have adverted was elaborate and exhaustive, and that the conclusion reached was predicated in a large measure, if not exclusively, on the views entertained by the court relative to the questions of the same nature as those raised in the case at bar. The case is well reasoned, and appeals to us with much force as being sound in principle, and in accord with the letter and spirit of our own fundamental law, and we quote liberally from the opinion, wherein the court say:

"The office being constitutional and elective, the voters of the county are authorized to fill it at the first opportunity given under the constitution. This right cannot be taken away from them by the legislature, either directly or indirectly, by an act postponing the choice of the officers named until a general election at which they might

be elected has passed. When the framers of the constitution and the people who adopted it said in that instrument that 'there shall be elected in each county by the voters thereof, at the time of holding general elections,' the officers named, they could have meant nothing else than that the succession to these offices should be secured, without vacancies or unnecessary extensions of terms by holding over after the expiration of the constitutional terms, by the election by the voters of each county of successors to such officers, who would be ready to take the offices and discharge their duties immediately upon the expiration of the terms of the previous incumbents. The only natural and reasonable time for such selection would be at the general election next preceding the expiration of the term of the incumbent. If the power of the legislature to postpone the choice of the successors to the incumbents of these offices at such election is conceded, it follows that the time for the election of such successors rests wholly in the discretion of the general assembly. If this is the law, the control of the offices affected is taken from the people and resides exclusively in the legislature." And again: "The argument that the legislature may fix the time of the commencement of the terms of office, where that time is not fixed by the constitution itself, and that if the term of an incumbent is extended beyond the constitutional limit, the officer holds over by virtue of section 3 of article XV, constitution, which provides that an officer shall hold his office for the constitutional term, and until his successor is elected and qualified, is fallacious. The latter provision was intended to prevent vacancies in the public offices to which it applies. It cannot be understood to confer on the legislature the power to postpone unnecessarily the election of a successor to the office, and thereby create a condition authorizing the incumbent to hold over after the expiration of his term. The mischiefs which would result from this construction of the constitution and the recognition of this authority in the legislature are too evident to require discussion.

By the adoption of measures of this character the legislative department could appropriate to itself an extensive and dangerous power and influence over a great number of offices and officers."

We should not pass from this subject without referring to *State v. Hedlund,* 16 Neb. 566.   In that case it appears that a statute providing for township organization contained the provision that county judges in such. counties should be elected at the first general election after the adoption of township organization, and each second year thereafter.   This, in the case cited, is construed to mean "the first general election at which the county officers named are to be elected," and it is held the general statute, which provided that county officers should be elected in the year 1879, and each second year thereafter, controlled and required the election of county judges under township organization to be held in the odd years.   Quoting the constitutional provision relative to the term of county judges, the court then observes: "County judges were elected in October, 1875, and every second year thereafter until and including 1883.   The legislature possesses no power to change the year in which such elections are to be held, nor shorten the term of office."   It is apparent that this expression as to the effect of the constitutional provision relative to the tenure of office of county judges was given as another reason for construing the statute as the court in that case did.   It seems to be conceded by counsel for respondent that this opinion of our own court is opposed to their construction of the constitution, but it is argued that, in so far as the case may be said to be against them, it is merely dictum and without binding force.   The language used can hardly be regarded as wholly dictum for the reason above stated.   It appears to be the deliberate expression of the court, and, so far as we can observe, a correct construction of the constitutional provision there under consideration.

Chief reliance for authority in support of the validity of the act of the legislature being considered is placed by

counsel for respondent on a recent decision of the supreme court of Kansas in the case of *Pruitt v. Squires,* 64 Kan. 855, 68 Pac. 643. There is found in that opinion, it is to be frankly stated, much that seems to support the construction of the act in question contended for by the respondent. The two cases may, however, be distinguished in their more marked characteristics. It may also be said the decision in the Kansas case was by a divided court, two of the judges dissenting. The Kansas constitution provides: "All county officers shall hold their offices for the term of two years, and until their successors shall be qualified  *  *  *  but no person shall hold the office of sheriff or county treasurer for more than two consecutive terms." It was this provision only the court was construing. The election law there under consideration postponed the time of election of these officers from 1901 to 1902, but made no provisions for filling the interregnum thus created. The court held, first, that the provisions for holding over applied to the second as well as the first term of the officers named, and that such holding over was a part of the second term; secondly, that there was no vacancy created by the legislative enactment postponing the election, and the governor was not authorized to appoint as though a vacancy existed; and, thirdly, no means of supplying such offices during the interregnum having been designated, such incumbents would continue to hold until their successors chosen in the usual manner had qualified. The questions thus presented and decided in that case differ from those in the case at bar in this: the constitution of that state does not designate the time when the term of office should begin and the time when it should end, but only provides that county officers shall hold their offices for the term of two years, and until their successors should be qualified, with the added provision that sheriffs and treasurers shall not hold for more than two consecutive terms. Our constitution provides expressly when the terms of judges of the supreme court and of regents of the university shall begin and when they shall end, and that

they shall continue for six years. The act of the legislature of this state providing for biennial elections attempts to break in upon this continuity of terms, but there is no such objection to the Kansas statute. If our constitution fixes the terms of these officers, and provides for a continuity of terms, so that when one officer holds over his term, he thereby holds a part of the term of his successor, then the question with us is, can the legislature change the arrangement, and provide a different time for the beginning and ending of the terms, and that the terms of the present incumbents shall be changed by adding a definite period thereto? Speaking generally as to the meaning of provisions for holding over, or for an indeterminate period, it can hardly be doubted that, even if it is beyond the power of the legislature, rightfully, to prevent an election at the time it should be held in conformity with constitutional provision, yet, if a failure of an election should happen, or if for any other reason no person was authorized to succeed to the office, under the provisions of the constitution, section 20, article XVI, the incumbent officers would hold over until successors were legally chosen. There is, however, no occasion, nor, as it appears to us, sound reason, for giving this section an enlarged meaning beyond this.

6. It is argued by respondents that, because the provisions of the constitution relative to the holding of general elections for judicial officers are found in article XVI, called the "Schedule," such provisions should be regarded as having been inserted for temporary purposes only, and without permanency of character. These provisions, it is said, are to be held merely as temporary expedients, necessary for the time being, in bridging over the break between the old and the new order of things. The reason for the creation of the "Schedule" is, it is suggested, made manifest in its introductory, wherein it is stated: "That no inconvenience may arise from the revisions and changes made in the constitution of this state, and to carry the same into effect it is hereby ordained and declared." It

may be, and probably is, true that a schedule proper, or that part of an organic law devoted exclusively to provisions for the transition of the affairs of government from the existing order of things to the conditions arising under the operation of the new instrument, should be regarded as of a temporary character and to be ignored when its purposes have been subserved. It is, however, quite manifest that the article which is denominated as the "Schedule" in our constitution contains many provisions of as lasting and permanent character as those found in other portions of the document, and is obviously so intended by its framers and the people adopting it. In fact, the instrument could be regarded only as a very imperfect one, leaving to the legislature the exercise of many powers usually controlled by the fundamental law, if these provisions are construed as having been incorporated for temporary purposes only. If counsel's contention in this regard be correct, then the legislature is authorized to change the time of holding general elections to any date it may so decree, since the provision regulating the time of holding elections is found in the schedule. This construction, however, it is manifest, cannot be entertained nor scarcely thought of. The same may be said of many other provisions found therein of the same undoubted permanent character. The language used should be given its ordinary meaning, and whether a provision is intended to be of a temporary or permanent character must be determined from the purpose of the enactment and the object sought to be accomplished thereby. "The most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the *reason* and *spirit* of it, or the cause which moved the legislator to enact it." 1 Blackstone's Commentaries (Chitty's), 61. So construing the provisions of the constitution we have been considering, we have no hesitancy in saying that they are and should be held as being of a lasting character, even though found in an article denominated a "Schedule."

7. Finally, it is argued that the court should give great weight to the legislative construction of the constitution, when legislation is had regarding subjects of a political nature. The rule contended for seems to be sound and reasonable, and, although we accord to it all the force contended for, we cannot escape the conclusion that the provisions of the fundamental law we have been considering will not bear a construction permitting or authorizing the legislature to change, as it has attempted to do, the time of holding elections for judicial officers, and the time when their respective terms of office shall begin and terminate, and to extend the terms of all present incumbents for one year, in the face of such provisions. The conflict is so palpable that the legislative enactment must give way. The action of the legislative branch of government is entitled to and should receive from the judicial department the greatest of respect and deference. This has been freely accorded and ever kept in mind in the consideration and discussion of the case at bar. The court should and does approach a conclusion resulting in a holding that the law is unconstitutional with great caution and hesitancy. The wisdom, policy and expediency of the law have not been allowed, that we are conscious of, to, in the slightest degree, influence our decision. We have endeavored to keep within the legitimate sphere of action belonging to the judiciary and, in so far as human fallibility permits, to reach a conclusion from a strictly legal and judicial standpoint. The final and ultimate construction of the provisions of the constitution is by that instrument entrusted to the courts. We have endeavored to discharge the trust thus reposed in the tribunal over which we for a time give expression to its utterances and decrees according to the meaning expressed or arising by necessary implication. In so doing, we are unable to escape the conclusion that the legislative enactment in controversy conflicts with several of the provisions of the fundamental law, and that the former must give way and be declared without legal force, inoperative and void,

It follows that the writ must issue as prayed, and it is, accordingly, so ordered.

WRIT ALLOWED.